FILED 18 NOV '22 10:41 USDC-ORP

Derek Bluford 77108-097
Plaintiff, In Pro Se
FCI Phoenix
37910 N.45th Ave
Phoenix, AZ 85086

## IN THE UNITED STATES DISTRICT COURT

## IN THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **DEREK BLUFORD,**<br><br>                    **Plaintiff,**<br><br>          **v.**<br><br>**DEWAYNE HENDRIX, et, al,**<br><br>                    **Defendants.** | **Case No. 3:22-cv-01005-SI**<br><br>**VERIFIED FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

### I. PARTIES

Below are the party's names, addresses, and telephone numbers:

Plaintiff:
Derek Bluford
FCI Phoenix
37910 N.45th Ave
Phoenix, AZ 85086
Telephone: N/A

Defendants: All of the Defendants are sued both in their Individual Capacities, as well as their Official Capacities.

| | |
|---|---|
| Warden, Mr. DeWayne Hendrix<br>27072 SW Ballston Road<br>Sheridan, OR 97378 | Associate Warden, Mr. R. Bills<br>27072 SW Ballston Road<br>Sheridan, OR 97378 |
| Associate Warden, Mr. Cooper<br>27072 SW Ballston Road<br>Sheridan, OR 97378 | Western Regional Director, Ms. Melissa Rios<br>7338 Shoreline Drive<br>Stockton, CA 95219 |

1

| | |
|---|---|
| Correctional Case Manager, Mrs. Ayala-Pena<br>27072 Ballston Road<br>Sheridan, OR 97378 | Correctional Counselor, Mr. Brent Cray<br>27072 Ballston Road<br>Sheridan, OR 97378 |
| Correctional Counselor, Mr. A. Rodriguez<br>27072 Ballston Road<br>Sheridan, OR 97378 | Dr. Andrew Grasley<br>27072 Ballston Road<br>Sheridan, OR 97378 |
| Dr. Campagna<br>27072 Ballston Road<br>Sheridan, OR 97378 | Lieutenant, Mr. David Prock Jr.<br>27072 Ballston Road<br>Sheridan, OR 97378 |
| Unit Manager, Mr. Sponselor<br>27072 Ballston Road<br>Sheridan, OR 97378 | BOP Director, Mr. Michael Carvajal<br>320 First Street N.W.<br>Washington, DC 20534 |
| DOES 1-99 | |

## II. BASIS FOR JURISDICTION

Under 42 U.S.C. 1983, Plaintiffs may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), Plaintiffs may sue federal officials for the violation of certain constitutional rights. Plaintiff Derek Bluford is bringing this suit against Federal officials (a Bivens claim).

The Defendants are or were an employee of the United States Department of Justice, Federal Bureau of Prisons. Furthermore, the Defendants were on active duty and working while the events took place, which have now resulted in this lawsuit, therefore constituting the Defendants acting under color of federal law.

## III. INTRODUCTION

This action is filed by Derek Bluford, a non-violent federal prisoner who self-surrendered to the custody of the Federal Bureau of Prisons on May 20, 2021. Mr. Bluford brings this action requesting that the Court grant him damages and injunctive relief for the numerous constitutional violations, criminal acts, and retaliation he was subjected to and endured at the hands of the Defendants. This Complaint was prepared on Mr. Bluford's behalf

2

by his power-of-attorney, family, and friends.

## IV. STATEMENT OF CLAIMS

### CLAIM 1

In the beginning of September 2021, Federal Correctional Institution Sheridan was experiencing another Covid-19 outbreak. The Warden, DeWayne Hendrix and Associate Warden, Mr. Cooper, was aware of this and had instituted a lockdown/modified operations program for the institution. Attached hereto as Exhibit 1 is a true and correct copy of the Notification for the Inmate Population from FCI Sheridan. Around this time, the 2A Housing Unit had inmates showing signs of Covid-19. This was observed by the Plaintiff, Derek Bluford, who in-turn continued notifying staff, including but not limited to, the Warden, DeWayne Hendrix. Attached hereto as Exhibit 2 is a true and correct copy of one of Mr. Bluford's notices to the Warden. Due to Mr. Bluford's several medically documented heart conditions and health concerns, he also immediately notified the Unit 2 staff by speaking with them and sending "Inmate Request to Staff" forms electronically and through the institution mail to Correctional Counselor, Mr. Brent Cray and Case Manager, Mrs. Ayala-Pena. Attached hereto as Exhibit 3 is a true and correct copy of Mr. Bluford's Kaiser Medical Records. Attached hereto as Exhibit 4 is a true and correct copy of some of Mr. Bluford's Notices to Staff.

All of Mr. Bluford's requests were not responded to and ignored by staff. Furthermore, Mr. Cray warned Mr. Bluford again about "trying to cause trouble" for the institution by complaining about Covid-19. Mr. Cray stated, "this whole thing is being blown out of proportion" and that "it's nothing serious", as he has "had the 'China Virus'" and was perfectly fine." It should be noted that Mr. Bluford had previously tried to file a "Request for Administrative Remedy" regarding Covid-19 concerns. However, it was rejected by Mr. Cray, and in return Mr. Bluford was threatened by Mr. Cray and informed that if he continued with his complaint, which focused on staff breaking CDC Covid-19 Guidelines & BOP Covid-19 Policies & Guidelines, that "there would be hell to pay" and that he would receive an "Incident

Report". Mr. Bluford then sent "Sensitive Complaints" to upper management; however, some were not responded to, while others were rejected. Attached hereto as Exhibit 5 is a true and correct copy of some Rejected Sensitive Complaints.

Mr. Bluford then began to contact other BOP, Federal Correctional Institution Sheridan departments, such as Medical and Health Services, warning them about the cases/people infected with Covid-19 in his housing unit. Attached hereto as Exhibit 6 is a true and correct copy of some of Bluford's Medical Request regarding Covid-19.

On September 7, 2021, the medical staff came into the 2A Housing Unit, tested a few inmates and confirmed cases of Covid-19. Several inmates were then removed from the housing unit and rehoused in the gym. This process occurred once more the following day. Despite Mr. Bluford's medical request (Exhibit 6), which stated that he had Covid-19 symptoms and was requesting medical assistance, he was not tested for Covid-19 nor provided any medical aid. Mr. Bluford was informed by the medical staff that the institution did not have enough Covid-19 test for all inmates.

Concerned and seeking medical assistance, Mr. Bluford then wrote Dr. Andrew Grasley and informed him that he was not feeling well, citing numerous Covid-19 symptoms and fear over what could happen due to Mr. Bluford's medically documented heart conditions, which made him "High-Risk" for Covid-19. Attached hereto as Exhibit 7 is a true and correct copy of some of Mr. Bluford's Medical Request to Dr. Andrew Grasley.

For the next few days, Mr. Bluford continued to contact the medical department and 2A Housing Unit staff requesting medical help Attached hereto as Exhibit 8 is a true and correct copy of some of Mr. Bluford's Medical Request(s). All of Mr. Bluford's efforts had no success.

On September 9, 2021, Mr. Bluford's roommate Charles Topps was removed from the room for testing positive for Covid-19. Despite Mr. Bluford's roommate testing positive, and the two of them spending 23 hours and 45 minutes in the room together each day, due to the lockdown, medical still refused to test or provide medical aid to Mr. Bluford, despite Mr.

Bluford's worsening conditions. Instead, staff placed a notice on Mr. Bluford's door stating that he was "Not showing signs of illness", which was obviously false, reckless, and wantonly exposing/risking others. Attached hereto as Exhibit 9 is a true and correct copy of the Notice posted on Mr. Bluford's door.

On September 13, 2021, Mr. Bluford was found barely responsive by staff. An emergency respiratory encounter was performed, and Mr. Bluford was taken to the Salem Emergency Hospital via a third-party emergency ambulance. Attached hereto as Exhibit 10 is a true and correct copy of BOP Medical Report dated 9/13/2021. Mr. Bluford tested positive for Covid-19. Since then, Mr. Bluford has been experiencing continued chronic and severe pain in his legs, is medically wheelchair bound, continues to experience shortness of breath, nausea, and other "long-covid" symptoms. Attached hereto as Exhibit 11 is a true and correct copy of BOP Medical Record – Health Problems "current". Mr. Bluford was originally informed that he was "revived"; however, since then has been told that he only passed out. Medical staff did discuss in front of Mr. Bluford potential liability so to be "careful" regarding "what was written down", as Mr. Cray had contacted them earlier to stress the matter.

Despite Mr. Bluford contacting staff about the Covid-19 outbreak in his unit, the threats that he was receiving from staff, the need for medical assistance, and him being considered "high-risk" for a potential Covid-19 fatality, no action was taken. Instead, Mr. Bluford's request were met with mere negligence, retaliation, and cruel and unusual punishment which resulted in great damages both medically and physically to him. This situation could have been avoided. Yet, due to overcrowding, Director Carvajal, and the unconstitutional conditions of confinement, the Plaintiff suffered significantly.

**CLAIM 2**

On or about September 14th, 2021, Mr. Bluford returned to Federal Correctional Institution Sheridan from the Salem Emergency Hospital. Mr. Bluford was prescribed five medications within the next four months to help him with the severe and chronic pain that he

5

was experiencing, along with the nausea, vomiting, and other issues he had as a result from Covid-19. Attached hereto as Exhibit 12 is a true and correct copy of the medications that were prescribed to Mr. Bluford.

Despite being prescribed five medications, Mr. Bluford only ever received one of the five medications within the following 11 months. Attached hereto as Exhibit 13 is a true and correct copy of the sole medication that Mr. Bluford received. Due to the institution being lockdown and Mr. Bluford being wheelchair bound, he consistently spoke with and wrote Unit Staff, Medical and Health Services, and notified others (Warden, Associate Warden, and "Pill Call" staff delivering medications to the unit), complaining that he had not received his medications, and that he was in severe/chronic pain, and needed his medications. Attached hereto as Exhibit 14 is a true and correct copy of some of Mr. Bluford's request to Medical & Health Services. Once again, all of Mr. Bluford's requests were not responded to.

Mr. Bluford was originally scheduled for a medical exam follow up with Dr. Andrew Grasley, one week after he was taken to the emergency room (following an emergency respiratory encounter, testing positive for Covid-19, and being revived on September 13, 2021). Attached hereto as Exhibit 15 is a true and correct copy of the BOP Medical Record listing follow up date. However, not only weeks would pass without Mr. Bluford being seen by Dr. Grasley, but months passed until he was seen, at which point, the doctor was not available, and he was seen by another medical staff member. At this point, Mr. Bluford was only seen by medical due to the AUSA inquiry into Mr. Bluford's medical condition, as Mr. Bluford had filed for a compassionate release, due to no medical assistance, overcrowding, Covid-19, and other issues. While at medical, Mr. Bluford was advised by medical staff that he would need physical therapy; however, that the institution didn't offer such services. He was also prescribed medications for his severe/chronic pain, nausea, vomiting, and other issues. These prescriptions would never be given to Mr. Bluford and nothing was provided for his continued shortness of breath symptom.

Mr. Bluford was being denied his prescribed medications, medical services, medical follow up exams and psychology services, and all of Mr. Bluford's off-site medical appointments were cancelled that were scheduled in March 2022, due to "not enough staff available" and never rescheduled. Nearly 6 months passed, and Mr. Bluford was never rescheduled for his off-site medical appointment, despite him having a serious medical injury and being in need of assistance. Mr. Bluford sat in the SHU for 24 hours per day, with no medications for his severe and chronic pain, or any psychology services.

From September 2021 through August 2022, Mr. Bluford continued to put in numerous medical request both via electronically and through institutional mail, addressed to medical regarding his missing medications, and requesting medical attention. Attached hereto as Exhibit 16 is a true and correct copy of some of the medical requests that Mr. Bluford submitted. Yet again, none of his request were responded to and no action took place.

The Defendants actions were negligent and caused Mr. Bluford to endure cruel and unusual punishment. Furthermore, the Defendants actions deprived Mr. Bluford of liberty, and caused him to suffer great medical and physical damages.

### CLAIM 3

From September 2021 through August 2022, Dr. Grasley, Mr. Cray, and DOES 1-99 altered and/or falsified Mr. Bluford's medical and other records. These actions continued on for several months and ultimately caused Mr. Bluford's motion for Compassionate Release to be denied as the Court relied on the information found in these records.

Mr. Bluford was informed by Mr. Cray that he had taken steps with the medical department to block the chance of Mr. Bluford's motion being granted and removing any liability since Mr. Bluford was "trying to pursue suing the institution after they had saved his life".

Mr. Bluford could have been granted home confinement by the Court, which would have allowed Mr. Bluford access to the medications that he was prescribed (but never received) by

7

medical professionals, and access to medical services and treatment that Dr. Grasley failed to provide. However, Mr. Bluford has been forced to deal with the chronic/severe pain and a deteriorating medical state, all due to the illegal actions and cruel and unusual punishment that the Defendants subjected him to.

Corruption is widely known within the BOP, and yet no serious corrective actions were taken place to protect Plaintiff and other inmates. The corruption is so well known that even the Chairman of the Senate Judiciary Committee demanded that the Attorney General Merrick Garland immediately fire the director of the beleaguered federal Bureau of Prisons after a third-party investigation came out detailing the serious misconduct involving correctional offers.

While the BOP workforce amounts to only $1/3^{rd}$ of the Department of Justice personnel, its employees account for $2/3^{rd}$ of all criminal cases against DOJ workers since 2019. The investigation concluded with stating "BOP is a hotbed of abuse, graft and corruption, and has turned a blind eye to employees accused of misconduct. In some cases, the agency has failed to suspend officers who themselves have been arrested for crimes." Even staff who were recently part of a "rape club" were not all terminated. Many got to simply transfer their employment to another BOP facility. It's these types of actions that enable staff like Mr. Cray and others at FCI Sheridan to continue abusing their position, breaking laws, and causing widespread distress and harm.

Mr. Cray at this point had received notices via mail and calls from Mr. Bluford's attorney, Cyrus Zal, regarding the negligence, and threats that his client was continuing to receive from Mr. Cray.

The actions by the Defendants were malicious, fraudulent, cruel and unusual, and not only violated Mr. Bluford's liberty, but mislead the Court. The Defendants actions were the proximate cause for Mr. Bluford experiencing further damages both medically and physically.

**CLAIM 4**

On or about September 21, 2021, Mr. Bluford was being housed in the Federal

Correctional Institution Sheridan gym due to testing positive for Covid-19. Despite the gym having CDC Guidelines posters & BOP Policy notices posted all over, nearly all guidelines and policies were not being followed. Basic medications were not available, all inmates were not separated more than 6 feet, nor was water readily available. In addition, there were no medical staff readily available, nor were there any emergency buttons to notify staff of a medical emergency, as the closest staff was upstairs and several doors away (over 200-300 feet).

Prior to a court ordered inspection, due to concern regarding inmates constitutional rights being violated, there were over 60+ inmates housed in the gym. As each day passed, more inmates would come and go, which obviously lead to more cross contamination. There was only one shower available for all inmates, which was a mop/broom sink, and not Americans with Disabilities Act complaint. Attached hereto as Exhibit 17 is a true and correct copy of Petitioners Status Report in *Stirling v. Salazar*. Mr. Bluford is wheelchair bound and is therefore protected under the Americans with Disabilities Act (ADA). Attached hereto as Exhibit 18 is a true and correct copy of the BOP Medical Report identifying Bluford as "wheelchair bound".

Mr. Bluford contacted gym staff (DOES 1-99), the Warden, Mr. DeWayne Hendrix, Associate Warden, Mr. Cooper, his Housing Unit 2A Team, CMS, and medical staff regarding the shower not being ADA complaint and therefore seeking a reasonable ADA accommodation. However, no accommodations were provided, and Mr. Bluford was advised by Mr. Cray that if he needed to shower, that he just needed to make do with the shower provided.

While attempting to take a shower in the non-ADA complaint shower, Mr. Bluford fell, striking his head. He laid halfway in the sink/shower and floor which had chemicals and filth from inmates bathing themselves, for several minutes until Correctional Officer Pike, came into the shower, picked up Mr. Bluford and assisted him getting dressed and into his wheelchair.

Despite Correctional Officer Pike requesting medical services for Mr. Bluford and filing and Incident Report, medical never came. Mr. Bluford eventually had some bleeding coming from his ear shortly after the incident, and requested medical services with the next shift,

9

however, no one ever came. Mr. Bluford wrote requests to the medical unit (DOES 1-99), Warden DeWayne Hendrix, and to his Unit Team. No one ever responded, nor examined Mr. Bluford. Mr. Bluford's outside ADA complaints were rejected through the mail system, as he was informed by Mr. Cray that he was no longer able to file any more complaints.

The Defendants actions were negligent, cruel and unusual, and violated the Americans with Disabilities Act. The Defendants actions led to the Plaintiff suffering damages including but not limited to medical and physical injuries.

**CLAIM 5**

On or about September 30, 2021, Mr. Bluford was moved from the gym to the 3A Housing Unit. The Warden, DeWayne Hendrix ordered that all inmates be moved from the gym as a result of an embarrassing court order inspection which resulted to government officials finding that Federal Correctional Institution Sheridan being "inhumane" and conditions "resulting in widespread distress and harm" as evidenced in *Stirling v. Salazar* (3:20-cv-00712-SB).

Mr. Bluford was placed in a two-man cell with another wheelchair bound individual who was on an oxygen tank. Both Mr. Bluford and his roommate had lower bunk medical chronicles; however, staff still made them be in a bunk bed room. Mr. Bluford asked Correctional Counselor, Mr. A. Rodriguez to move him to an ADA room as he required a lower bunk. Mr. Bluford's request was denied. After several failed attempts to be moved, both Mr. Bluford and his roommate were forced to remain in the cell.

As Mr. Bluford was attempting to get on the higher bunk bed (because his roommate was over 60 years old and obese) with his roommate's assistance, he fell several feet from off of the bed onto the floor and injured himself. Mr. Bluford requested medical attention but was informed that doctors and nurses had already left for the evening, and the Mr. Bluford should just sleep on the floor. In the days proceeding, a staff member from medical did come to the unit, only to try and have Mr. Bluford sign a temporary waiver/release for being housed in a

non-ADA cell with a low bunk which was back dated. Mr. Bluford refused to sign. It's important to note that in the Governments Status Report regarding the Court ordered inspection of Federal Correctional Institution Sheridan, they found that the institution had medical facilities; however, that "medical services were not available to inmates", and that the institution was drastically understaffed.

Over the next few weeks, Mr. Bluford wrote and notified Warden DeWayne Hendrix, 3A Housing Unit Staff (DOES 1-99), 2A Housing Unit Staff, and medical requesting to be moved due to the non-ADA complaint living conditions that Mr. Bluford and his roommate were being subjected to.

The Defendants actions were reckless, negligent, cruel and unusual and resulted in great damages to the Plaintiff including medical and physical damages.

**CLAIM 6**

Since June 2021, when Mr. Bluford raised his first complaint to Mr. Cray, Mrs. Ayala-Pena, and Warden DeWayne Hendrix, regarding a major security score error that he found. Mr. Cray and Mrs. Ayala-Pena have intentionally been causing problems for Mr. Bluford and intentionally retaliating against him. Mr. Bluford found that he was being housed at a "Medium Security Level" prison, which housed murderers, child molesters, rapist, bank robbers and even drug cartels, when in fact Mr. Bluford was scored wrong and should have been housed at a "Low Security Level" prison with less violent people.

The Bureau of Prisons overlooked that Mr. Bluford had earned his high school diploma and therefore scored him correctly by adding +2 Security Level Points to Mr. Bluford's base score. These additional points moved Mr. Bluford from a "Low Security Level" to a "Medium Security Level" therefore placing him with more violent offenders. Upon Mr. Cray and Mrs. Ayala-Pena learning this information, they intentionally took no action to correct it. Mr. Bluford's attorney even contacted Mr. Cray, Mrs. Ayala-Pena, the Case Manager Coordinator Mrs. Bunsold, and Warden DeWayne Hendrix alerting them of this particular issue. Attached

hereto as Exhibit 19 is a true and correct copy of Mr. Zal's letter to CMC Ms. Bunsold.

Mr. Bluford was then threatened by Mr. Cray that he and Mrs. Ayala-Pena could make things worse for him by intentionally making him go the "long way" to get to a camp, by only lowering him to 13 points, if he continued on with his complaints and having his attorney bother them.

As Mr. Bluford was stressed over these threats, he requested to meet with a psychologist on-site. Weeks later, Mr. Bluford met with Psychologist Mr. Bindl and confided in him. Mr. Bindl made notes of these threats, and informed Mr. Bluford that he could report them. Over the next few months, Mr. Bluford contracted Covid-19, filed complaints, and ultimately received more threats and acts of retaliation against him from Mr. Cray, Mrs. Ayala-Pena, and Mr. Sponselor. Mr. Bluford notified the Warden, DeWayne Hendrix, of these matters, and Mr. Bluford also wrote the BOP Western Regional Office Director to notify them. No action or follow up ever took place.

In November of 2021, Mr. Cray and Mrs. Ayala-Pena did exactly what they threatened/warned Mr. Bluford that they would do. Instead of lowering Mr. Bluford to 11 Points (Minimum Security Level), as he had received no incident reports, no complaints, was programming above average, helping staff and inmates, and maintaining great family ties, Mrs. Ayala-Pena and Mr. Cray only lowered Mr. Bluford's points to 13 (Low Security Level), and intentionally falsified information on Mr. Bluford's records preventing him from not only lowering his security level, but further blocking him to earn additional time off of his sentence. In addition, Mr. Cray, Mrs. Ayala-Pena, and Mr. Sponselor, put a "Management Variable" on Mr. Bluford to keep him housed at a Medium Security Level institution.

It should be noted that Mr. Bluford's attorney previously mailed via certified mail with tracking Mr. Bluford's Team Meeting Report, that included all of the activities and progress that Mr. Bluford had made while at the institution. Mr. Bluford's attorney requested, as did Mr. Bluford, that if there were any discrepancies, that staff could notify Mr. Bluford in advance so

that Mr. Bluford could correct or prepare to provide his Unit Team with any additional information needed at his upcoming Team Meeting so that he was scored correctly. No response was ever received. Mrs. Ayala-Pena informed Mr. Bluford that she hadn't had time yet to review the report, and Mr. Cray belittled and mocked Mr. Bluford for having a report sent in.

Furthermore, Mrs. Ayala-Pena threatened Mr. Bluford by informing him that if he didn't sign a $400.00 per month contract for Financial Responsibility Payments, with no payment date, which was previously set at $25.00 per quarter, that he would be placed on "FRP Refusal" status, which would ruin Mr. Bluford's programming, and him being lowered to camp points (11 Points). Mr. Bluford explained that he had extra funds sent in for his academic and vocational classes, as Mr. Bluford was enrolled full-time in a Vocational Program that cost $853.00, and he just had finished earning his Bachelor's Degree, and had signed up and enrolled for his Master's Degree. All these programs were being paid for by Mr. Bluford's outside support group so that he could better himself by taking Evidence Based Recidivism Reduction Programs, as he was directed to do so by Bureau of Prisons staff.

Ultimately, Mr. Bluford was not able to make the FRP payments due to reasons beyond his control and was placed on FRP Refusal. Mr. Bluford was then immediately rescored and raised to 14 Points. A practice that is not done, nor is it policy to immediately "rescore" the inmate once they fall into the "FRP Refusal" status. It should be noted, that Mr. Bluford's FRP Payments were not comparative to other FRP Contracts, with inmates who had similar 6-month deposits, and higher restitution amounts owed. This was done as an act of retaliation. Furthermore, FRP Payments/Contracts are to take place during Team Meetings. Mrs. Ayala-Pena made Mr. Bluford sign this contract days before his meeting.

For over 7 months, Mr. Bluford continued to write and request a new FRP Contract from Mrs. Ayala-Pena. She refused, lied, and mislead Mr. Bluford on numerous occasions. Mrs. Ayala-Pena, in fact, denied the victim of Mr. Bluford's crime, any restitution payments for 7 months, despite Mr. Bluford's request to make payments.

13

All the Defendants failed to take action, which was the proximate cause for the Plaintiff being injured which resulted in great damages physically and medically.

## CLAIM 7

From June 2021 to June 2022, Mr. Bluford observed numerous staff intentionally not wearing their mask nor following CDC Covid-19 & BOP Covid-19 Guidelines and Policies, therefore increasing the risk of infection. Attached hereto as Exhibit 20 is a true and correct copy of some of the Negligent Activity Logs. Despite their reckless actions resulting in numerous Covid-19 outbreaks, leaving the institution to remain locked-down on several occasions, staff members negligently, wantonly, and intentionally carried on with these actions. Some staff even open spoke out about Covid-19 calling it a "hoax" and something that the "Democrats are trying to use to get into office" with by using as an excuse. From not wearing their mask nor proper PPE gear, to not even taking the most common-sense preventive measures, staff (DOES 1-99), including but not limited to, Correctional Counselor, Mr. Brent Cray, Case Manager, Mrs. Ayala-Pena, Correctional Counselor, Mr. A. Rodriguez, and others knowingly increased the risk of death, serious injury, and infection by their actions.

Mr. Bluford began keeping track of these actions in a "Negligent Activity Log", in which his attorney, Cyrus Zal, then requested specific "Litigation Holds" for corresponding video footage. Attached hereto as Exhibit 21 is a true and correct copy of some of the "Litigation Hold" notices from Cyrus Zal. In addition, the Warden, DeWayne Hendrix, BOP Western Regional Director, BOP General Counsel, BOP Director and other staff (DOES 1-99) were notified of these concerns, and reckless actions that could lead to infection, death and serious injuries. Yet, again, no action was taken. This kind of reckless actions is what directly related to the over 300+ inmate Covid-19 deaths and must be recognized. Furthermore, these actions lead to Mr. Bluford contracting Covid-19, being neglected for over a week, and then revived and taken to the Salem Emergency Hospital, which has since then left him wheelchair bound, along with several "long-covid" symptoms.

14

The Defendants actions were reckless, malicious, cruel and unusual, violated the Plaintiffs right of Liberty, and caused him great damages including but not limited to medical and physical injuries.

**CLAIM 8**

From June 2021 to January 2022, Mr. Bluford observed numerous staff intentionally mixing quarantined inmates with non-quarantined inmates, which was not only against BOP Policies, but reckless and made no sense (See Exhibit 20 - Negligent Activity Logs).

In the month of September, the week of the 13th, staff intentionally only tested one inmate in a cell, and if their test result came back positive, removed them, yet, kept their roommate in the cell with no test at all. This resulted in widespread distress and harm. The CDC states that if you are not wearing a mask, or within close proximity of an individual who is infected with Covid-19, that you are very likely to contract Covid-19 depending on the amount of time that you spend with the infected individual. Attached hereto as Exhibit 22 is a true and correct copy of the CDC Guidelines for Prisons. Due to the lockdown implemented by the Warden, all inmates were locked in their cells with their roommates for 23 hours and 45 minutes per day. Staff knew more inmates were infected, yet intentionally declined to test others. One medical nurse said that they were "trying to keep their Covid-19 numbers down".

Mr. Bluford kept track of these incidents in his "Negligent Activity Logs" which were sent to the Warden. Furthermore, these logs were provided in Mr. Bluford's complaints. However, his complaints were often rejected as Mr. Cray would not file the Level 1 "Informal Resolutions" or would return them to Mr. Bluford unprocessed (most of the time) and threaten him about filing anymore complaints. As Mr. Cray began to no longer give Mr. Bluford complaint forms or Inmate Request to Staff forms, Mr. Bluford was forced to have these documents copied and mailed to him in bulk. Mr. Bluford and his attorney even contacted the Warden, Associate Warden Mr. Cooper, BOP Western Regional Director, BOP Director and General Counsel asking that the local complaint levels (BP-8 and BP-9) be waived as he was

facing staff intentionally blocking and railroading his complaints. Yet, no response was ever received. Mr. Bluford was informed that he was no longer allowed to file complaints against staff or staff conduct.

Ultimately, the Defendant actions lead to Mr. Bluford getting infected with Covid-19 and him suffering numerous physical and mental damages. The Defendants actions were reckless, malicious, and negligent, which resulted in Mr. Bluford's liberty being violated, and him suffering great damages including but not limited to medical and physical injuries.

## CLAIM 9

As Mr. Bluford endured threats from staff, contracted Covid-19, and suffered through the conditions of confinement at Federal Correctional Institution Sheridan due to overcrowding, lack of medical and programming, he sought out counseling services through the psychology department with Dr. Bindl. However, once Mr. Cray became aware that Mr. Bluford had confided in Dr. Bindl and that Dr. Bindl had made notes regarding the specific threats (not lowering Mr. Bluford past 13 points at his next Team Meeting, disclosing) that Mr. Cray had made, Mr. Cray informed Mr. Bluford that he would no longer be able to see anyone in psychology. Mr. Bluford challenged Mr. Cray and said that he did not have that authority; however, Mr. Cray in turn informed Mr. Bluford that he was very close with Dr. Campagna, who is over the entire psychology department, and that Mr. Bluford could "mark his words".

For the next 10 months (November 2021- August 2022) Mr. Bluford would go on to never have another counseling session, despite his over two dozen written and electronic request to the Psychology department. Attached hereto as Exhibit 23 is a true and correct copy of some of Mr. Bluford's numerous requests to Psychology. The Bureau of Prisons even identified Mr. Bluford as an inmate who has experienced a "traumatic" event (Covid-19 / being revived / wheelchair bound) and yet still blocked Mr. Bluford from receiving and counseling/psychology services. Attached hereto as Exhibit 24 is a true and correct copy of the Traumatic Form issued to Mr. Bluford. In addition, the Defendants were very well aware of the adverse effects of

16

keeping an inmate locked down for such long periods of time, due to them receiving a thorough report from Doctor Grassien regarding the matter via litigation. Attached hereto as Exhibit 25 is a true and correct copy of the Declaration of Doctor Grassien. Yet, they continued with their malicious, reckless, and negligent actions.

While in the SHU, after numerous attempts to reach out to psychology, Mr. Bluford never received a response. During one of the days that Mr. Bluford was housed alone in his room, he contemplated and attempted to hang himself unsuccessfully. Mr. Bluford has a known anxiety issue, and yet psychology services were blocked from him. Furthermore, despite the typical stay for an inmate in the SHU is 3.98 weeks. Mr. Bluford stayed in the SHU for nearly 30 weeks, as a non-violent inmate, who was not there for any disciplinary reason. Psychology services were required to interview Mr. Bluford yet did not. Despite inmates being moved rooms every 21 days, Mr. Bluford was never moved. Mr. Bluford was forced to stay in his room 24 hours per day, 7 days per week, with his window blacked out, and abandoned at the end of one hall for nearly 30 weeks.

The Defendants actions were malicious, reckless, cruel and unusual, and resulted in great damages to the Plaintiff, which include but are not limited to medical and physical injuries.

**CLAIM 10**

During Mr. Bluford's time in the SHU (January 2022-February 2022), he was roomed with another inmate named DeAndre Johnston. This inmate was somehow able to get Mr. Bluford's home address, and then write Mr. Bluford's wife, pretending to be Mr. Bluford, and requesting that she electronically send the inmate (Mr. Johnston) $75,000.00. Attached hereto as Exhibit 26 is a true and correct copy of the letter that Mrs. Bluford received from DeAndre Johnston impersonating Mr. Bluford.

Mrs. Bluford, upon receiving the first letter, filed a police report (Folsom Police Department Report No. 22-0775) and contacted the Federal Bureau of Prisons, SIS (Special

Investigation Services) at Sheridan, as she knew that her husband didn't mail the letter, or write it, as it was not in his handwriting, grammar and punctuation were poor, and many words were misspelled. Attached hereto as Exhibit 27 is a true and correct copy of the letter that was sent to FCI Sheridan SIS. Nonetheless, despite Mrs. Bluford and Mr. Bluford's actions to stop any further letter being sent, several additional letters were sent to Mrs. Bluford via United States Postal Service mail from the inmate, Mr. Johnston, while he was at the Federal Correctional Institution Sheridan. Attached hereto as Exhibit 28 is a true and correct copy of the letters and envelopes that Mr. Johnston wrote.

Upon Mr. Bluford contacting SIS (David Prock, Jr.) regarding the matter, Mr. Prock Jr. was very condescending and informed Mr. Bluford that he should expect no help from the institution regarding the matter, and furthermore, that they would not investigate or make a referral for prosecution of the matter, due to Mr. Bluford filing complaints against staff.

Mr. Johnston is guilty of mail fraud and conspiracy to commit wire fraud. SIS Lieutenant David Prock Jr. had copies of all the letters (provided to him by Mrs. Bluford) and envelopes that Mr. Johnston mailed and used for his crime(s), yet Mr. Prock Jr. intentionally wanted to deprive both Mr. and Mrs. Bluford of due process, and life/liberty by not reporting or investigation a crime out of retaliation.

Mr. Bluford, Mrs. Bluford, and their attorney contacted the Warden DeWayne Hendrix, the Bureau of Prisons Western Regional Office, Oregon U.S. Attorney's Office, and the Oregon FBI and Postal Inspection. Attached hereto as Exhibit 29 is a true and correct copy of the letters that were sent to BOP Western Regional and the United States Attorney's Office in Oregon. All Departments needed more information or a referral/complaint from the institution. None was provided.

The Defendants actions were negligent and malicious, which caused Mr. Bluford to suffer mental damages. Furthermore, their actions were cruel and unusual, which violated Mr. Bluford's constitutional rights and caused him pain and suffering. The Defendants violated Mr.

Bluford's due process, and equal protection clause, as if Mr. Bluford were not an inmate, Mr. Johnston would be prosecuted.

## CLAIM 11

Mr. Bluford was placed in the SHU at FCI Sheridan on January 25, 2022, pending a threat assessment. Attached hereto as Exhibit 30 is a true and correct copy of the Administrative Detention Order. In the prior month of December and leading up until the incident date (1-25-2022), Mr. Bluford was being extorted for cooperating with the government. This information was disclosed to inmates by Mr. Bluford's Correctional Counselor, Mr.Brent Cray in retaliation.

Sarah Bluford, (Mr. Bluford's wife), called FCI Sheridan and spoke with staff on January 17, 2022, requesting that someone check on her husband as she had concerns regarding his recent conduct/communication. Attached hereto as Exhibit 31 is a true and correct copy of the phone records of Mrs. Bluford showing a call to FCI Sheridan on 1-17-2022. Mr. Bluford was then called to the metal shack where the lieutenants office is held. Mr. Bluford spoke with a lieutenant who he believed was named "Turner", however, in fact the lieutenants name was "Taylor." Lt. Taylor asked Mr. Bluford if he was doing okay, however, Mr. Bluford was unable to acknowledge or go into any detail about any issues, due to the fact, that his extorter (Mr. Milton Carter) went with him to the lieutenant's office and gave him only "1 minute" to be in there. Mr. Taylor confirmed calling Mr. Bluford up to the lieutenant's office and receiving a call from Mr. Bluford's wife. After being in the office less than a minute, Mr. Bluford returned to his housing unit.

On 1-25-2022, Mr. Bluford once again went to the lieutenant's office. This time due to receiving an unreasonable demand letter for $10,000 from the same main extorter Mr. Milton Carter. This time, while at the lieutenant's office Mr. Bluford spoke with Lt. Cerone, Captain Galberth, and Correctional Counselor A. Rodriguez. Upon giving the extortion letter to Lt. Cerone, Lt. Cerone informed Mr. Bluford that "once I read this, that I can't unread it". Mr. Bluford was then further informed that if staff believed that there was a threat after reading the

19

letter, that they would have to place him in the SHU for protection under an Administrative Detention Order. After Lt. Cerone read the letter, Mr. Rodriguez took possession of it, and they began processing Mr. Bluford to be placed in the SHU. Lt. Cerone later confirmed remembering Mr. Bluford come to the Lieutenants office with the letter. Attached hereto as Exhibit 32 is a true and correct copy of the Response from Lt. Cerone.

During the initial interview process at the lieutenant's office, Mr. Bluford voiced his concern and frustration over his belief that Correctional Counselor Brent Cray informed inmates that he cooperated. Mr. Bluford believed that due to Mr. Cray's threats regarding disclosing this information previously and the fact that the inmates extorting Mr. Bluford informed him that Mr. Cray told them, Mr. Bluford said that he found it plausible. This statement infuriated Mr. Rodriguez, and he told Mr. Bluford that he has worked with Mr. Cray for almost twenty years, and that he would not let Mr. Bluford cause him trouble.

Mr. Bluford was then detained, handcuffed, and taken to the SHU. Upon Mr. Bluford's arrival at the SHU, he was immediately, strip searched, and changed into SHU clothing. All of Mr. Bluford's belonging were confiscated, logged, and reported on an inventory/property receipt form. Attached hereto as Exhibit 33 is a true and correct copy of the Inventory log. The extortion letter was no longer with Mr. Bluford and was retained at the lieutenant's office. The extortion letter was an important piece of evidence, in which Lt. Cerone remembers Mr. Bluford bringing to his office. Yet, it was later claimed that "no evidence" was found to support the extortion.

Mr. Bluford was then taken to the SHU, carried down the stairs (Mr. Bluford is wheelchair bound) and placed in cell 308. The typical stay for an inmate in the SHU in BOP is 3.98 weeks. Mr. Bluford remained in the for nearly 30 weeks as a non-violent, low security level inmate, placed in the SHU for Administrative and NON-disciplinary reason. Mr. Bluford was abandoned in his cell for 24 hours per day, and was only allowed to leave his cell around 4 times. Mr. Bluford was denied recreation, law library, and even kept downstairs for

20

shakedowns. Mr. Bluford remained in the SHU from 1-25-2022 through 8-9-2022.

David Prock Jr. is a FCI Sheridan SIS Officer, holding the rank of lieutenant. Mr. Prock opened, managed, and closed the investigation (Case: SHE-22-0073) regarding Mr. Bluford. Specifically, on April 13, 2022, Mr. Prock requested that Mr. Bluford be brought to him for an interview regarding the then active investigation. This is the first and only time that Mr. Bluford spoke with Mr. Prock regarding the incident. It should be noted that Mr. Bluford was previously informed that his SIS Investigation/Case would be intentionally delayed, so that he would have to spend more time in the SHU for filing complaints against Cray and SIS via "Request for Administrative Remedies". By April 13, 2022, Mr. Bluford's Investigation/Case had already been extended twice, bringing it to mandatory action/review. It should be noted that other SIS Investigations/Cases opened after Mr. Bluford arrived at the SHU on 1-25-2022, and those cases were adjudicated before Mr. Bluford's (this supports that Mr. Bluford was being abandoned/retaliated against).

During Mr. Bluford's interview with Mr. Prock, Mr. Bluford immediately noticed that Mr. Prock was very dismissive, inattentive and condescending. He seemed to only be interested in Mr. Bluford dropping and stopping his complaints against Mr. Cray and SIS. Nevertheless, Mr. Bluford walked Mr. Prock through the incident(s) that took place in the month of December 2021 and January 2022. Mr. Bluford explained that Mr. Prock could easily pull up his emails from TRULINCS to verify that he (Mr. Bluford) sent and email to his wife requesting money be sent to an individual (Aaron Mitchel), and also that Mr. Prock could pull up the security footage from the 2A Housing Unit covering the computer area, which would show Mr. Milton Carter (the extorter) reviewing Mr. Bluford's email before having him send it off. Mr. Milton Carter demanded Mr. Bluford order his wife to Zelle $200.00 to his contact Aaron Mitchel. Upon Mrs. Bluford receiving the email she paid the money. Attached hereto as Exhibit 34 is a true and correct copy of the Zelle Receipt. Finally, when discussing his cooperation with Mr. Prock, Mr. Bluford did confirm that he participated in the government's investigation into numerous

current and former politicians.

After Mr. Bluford's interview concluded with Mr. Prock, on April 13, 2022, Mr. Bluford was then informed that his SIS Investigation/Case was "closed" on April 25, 2022, and that the "threat was verified", and that he would be transferred. Then the paperwork began to be processed to start Mr. Bluford's transfer.

As the next few days and weeks passed, Mr. Bluford wanted to make sure that his complaints were logged (as many of them were being returned untouched, not responded to, and destroyed) with the executive staff (Warden, A.W., Lieutenants, Team, etc.) as he had been voicing his concerns to them on walkthroughs but wasn't getting anywhere. So, Mr. Bluford once again attempted to submit "Request for Administrative Remedies". Once again, they were returned/destroyed, and Mr. Bluford was informed by Mr. Cray that he would let others know that he attempted to file complaints again. Being that Mr. Prock was involved in one of the complaints, Mr. Cray notified him.

On May 21, 2022, Mr. Prock directly retaliated against Mr. Bluford by creating a fraudulent Incident Report. Attached hereto as Exhibit 35 is a true and correct copy of the Incident Report filed by Mr. Prock. Mr. Prock's Incident Report was extreme and outrageous and for the purpose of causing Mr. Bluford emotional distress. Mr. Prock had a duty to investigate thoroughly and honestly report his findings. Mr. Prock breached that duty by altering his reports to now support his Incident Report against Mr. Bluford.

Despite Mr. Prock closing Mr. Bluford's SIS Case on April 25, 2022, he falsified a federal document (Mr. Bluford's Incident Report) claiming that he had "just become aware the Mr. Bluford's case had closed" nearly 26 days later (after HE closed the case). Mr. Prock did this to meet BOP guidelines/policy that Incident Reports must be written and issued within 24 hours. In addition, the "Incident Date" on the "Incident Report" is logged as April 11, 2022, which is nearly 40 days before the Incident Report was even issued, and not even the day that Mr. Bluford met with Mr. Prock (which was April 13, 2022).

In Mr. Prock's fabricated Incident Report, he claims that the didn't find any evidence to support Mr. Bluford's allegations, and that "evidence found" supported the claims that Mr. Bluford's statements were fictitious. Mr. Prock does not reference this "evidence", as there is none to support or even hint that Mr. Bluford's statements were false. The entire Incident Report is obviously false, as the honest and respectable Lieutenants Cerone and Taylor clearly provide opposing/conflicting statements with those found in Mr. Prock's Incident Report. Mr. Prock obviously removed, deleted, or intentionally looked over all supporting evidence of Mr. Bluford's claims, and was simply looking to cause harm to Mr. Bluford.

Mr. Prock continues on in the Incident Report stating that 1) Mr. Bluford did not cooperate; and 2) Mr. Bluford provided the FBI with fake "text messages" and "audio recordings." Mr. Prock states that he confirmed all of this through Mr. Bluford's court pre-sentencing report. This is again false and was used to cause Mr. Bluford emotional distress and place him at risk by documenting in an Incident Report that was delivered, issued, and read in front of other inmates. Mr. Bluford's pre-sentencing report will show that Mr. Prock's statements are false and incorrect. The United States Attorney's Office published and uploaded Mr. Bluford's opening of an FBI Confidential Human Source on PACER. Attached hereto as Exhibit 36 is a true and correct copy of the Opening of a CHS filed by USAO. The United States Attorney's Office also published and uploaded the "Statement of Facts" in Mr. Bluford's case (#2:18-cr-00008-JAM) and nowhere does it say that Mr. Bluford provided fake "text messages" or "audio recordings."

Mr. Bluford has endured great emotional distress, stress, threats, act of retaliation, and physical injuries all at the hands of FCI Sheridan staff. As a final punishment, in response to and as a procedural result of Mr. Prock's false Incident Report, Mr. Bluford was sentenced to 60 days lost privileges by none other than the staff who was involved in the problem, Mr. Brent Cray. Two staff who were clearly involved in the incident, clearly retaliated against Mr. Bluford. This not only violated Mr. Bluford's right to due process but were not even in

23

accordance with BOP Policy.

The false incident report that was filed by Mr. Prock continued to have adverse actions against Mr. Bluford, such as blocking Mr. Bluford from having his score lowered, Mr. Bluford being denied participating in the children's day event at FCI Phoenix, as well as other adverse actions.

**CLAIM 12**

From September 2021 until Mr. Bluford left Federal Correctional Institution Sheridan in August of 2022, Mr. Cray, Mrs. Ayala-Pena, Mr. Sponselor, and Dr. Andrew Grasley refused to assign Mr. Bluford an inmate caregiver, move Mr. Bluford in the 2A Housing Unit ADA Cell, or provide him with reasonable ADA accommodations. When Mr. Bluford asked Mr. Cray to be moved into the ADA cell, Mr. Cray refused, and informed Mr. Bluford that that room was being used for storage. When Mr. Bluford elaborated and explained that he was unable to move around in his non-ADA complaint cell (as he is wheelchair bound), and faced embarrassing challenges when attempting to toilet, often requiring Mr. Bluford to have to crawl and otherwise maneuver his body to get on the toilet, which often left him with feces on himself and his clothing, Mr. Cray still refused to move him into the ADA cell, and informed him that he "didn't have anything coming from me since you want to try and sue us." Furthermore, Mr. Bluford even faced challenges showering, as the shower in his housing unit was not ADA-complaint and did not have a shower bench for him to bath himself. Mr. Bluford would often get burned while trying to shower as he could not move quick enough from the ever-changing water temperature. Again, Mr. Bluford made ADA-accommodation requests to Mr. Cray and to the CMS Department requesting services. Attached hereto as Exhibit 37 is a true and correct copy of some of Mr. Bluford's request for ADA accommodation. These requests were ultimately denied due to the fact that Mr. Cray did not respond to them. Mr. Cray informed Mr. Bluford that he "could care less" about Mr. Bluford's challenges since he was "trying to sue him and the prison".

When Mr. Bluford asked Mrs. Ayala-Pena to be moved, she deflected and told Mr.

Bluford that she was going with what Mr. Crays decision was, which was no, as he was in charge of the room changes.

Mr. Bluford sent a written Inmate to Staff Request form to Unit Manager Mr. Sponselor, and to Dr. Andrew Grasley, however, no response was ever received. In addition, Mr. Bluford was asked the Warden, DeWayne Hendrix, and was informed that he could reach out to Dr. Campagna asking to be moved to the 4B Medical Unit as she was in charge of it. Mr. Bluford sent several requests; however, never heard back. Attached hereto as Exhibit 38 is a true and correct copy of some of Mr. Bluford's request to Dr. Campagna.

After getting no assistance, Mr. Bluford reached out to the BOP Western Regional Director requesting assistance or to be moved. Attached hereto as Exhibit 39 is a true and correct copy of the Letter to Regional Director. Mr. Bluford then reached out the BOP Director requesting the same thing. No responses, assistance, or accommodations were ever provided. Attached hereto as Exhibit 40 is a true and correct copy of the Letter to BOP Director.

Finally, after getting nowhere, Mr. Bluford attempted to file a Request for Administrative Remedy, at which point Mr. Cray told him that he would not be getting anymore complaint forms, and that Mr. Bluford's disability complaint forms were rejected as incoming mail, as Mr. Bluford had requested outside disability complaints regarding Federal Correctional Institution Sheridan. Finally, Mr. Bluford was informed that he tried to get anymore complaint forms, that it would result in an Incident Report and that he was "playing with fire" that "could lead him to physical harm".

Under the Eighth Amendment, prison officials must meet the medical needs of prisoners with disabilities and furnish the assistance that they require in order to live a minimally decent life in prison. Wheelchair and bed bound prisoners are entitled to receive appropriate medical treatment as well as adequate toilet facilities and means to keep themselves clean. The Plaintiff was intentionally blocked of these rights. The federal ADA and Section 504 of the Rehabilitation Act apply to Mr. Bluford.

25

Mr. Bluford requested access to an ADA-complaint computer, laundry services, cleaning supply room, and hot water tank, as all of these items were not available as they required an individual to travel upstairs to access them. (See Exhibit 37). Mr. Bluford was unable to do this.

The Plaintiffs reasonable requests were often met with extreme mockery, retaliatory threats/actions, and a careless disregard due to Mr. Bluford filing complaints. Mr. Cray even informed Mr. Bluford that he did not know what ADA was. Attached hereto as Exhibit 41 is a true and correct copy of Mr. Cray's response to the Grievance.

The Defendants actions were reckless, cruel and unusual, and negligent, resulting in great damages and violations of numerous Federal laws, which resulted in medical and physical injuries to the damage. Failure to provide accessible facilities denied Mr. Bluford equal opportunities for yard time, recreation, programming, and inflicted unnecessary isolation on him as a result of his disability.

## CLAIM 13

From June 2021 through August 2022, Mr. Bluford suffered from retaliation from the Defendants. Mr. Cray initiated and led this campaign of harassment and used his nearly 20 years of relationships/bonds within the Bureau of Prisons to retaliate against Mr. Bluford all due to Mr. Bluford exercising his constitutional rights and catching Mr. Cray commit crimes. Mr. Cray and Mrs. Ayala-Pena threatened, bullied, falsified federal documents, facilitated/allowed inmate gambling, and directed inmates to harm Mr. Bluford, instead of him just working with his colleagues to simply fix the issues at hand, and get Mr. Bluford transferred to the proper institution.

Superiors, including but not limited to, the Warden, Associate Warden, Unit Manager, BOP Western Regional Director, BOP Director and others (DOES 1-99) turned blind eyes from Mr. Cray's actions towards Mr. Bluford. Instead of stepping in and doing what was right, not just right by the law, but right by the BOP Policy, they instead urge Mr. Bluford to "make up" with Mr. Cray and then suggested that things would get better.

The Warden, Associate Warden, Mr. Sponselor, BOP Regional Director, and BOP Director had duties to investigate Mr. Bluford's sensitive complaints yet failed to do so thereby enabling Mr. Crays illegal and criminal actions.

A great portion of the retaliation endured by Mr. Bluford came to him due to Mr. Bluford assisting Chief Federal Public Defender, Lisa Hay in her pursuit to bring the conditions of confinement to light in active court case (*Stirling v. Salazar*). Mr. Cray would often threaten Mr. Bluford that he needed to stop encouraging and helping inmates file petitions to join in on the Habeas Corpus case against the institution, which was violating numerous constitutional rights. Attached hereto as Exhibit 42 is a true and correct copy of the Copy of Petition. Mr. Cray's threats would span from insinuating inmates finding out that Mr. Bluford assisted the government, to Mr. Cray shipping Mr. Bluford to another "higher security prison" for potentially inciting a riot or locking him in the SHU, to making sure that Mr. Bluford did not make it to a camp or lower custody institution.

Correctional Counselor Mr. A. Rodriguez, SIS Lt. David Prock Jr., and Mr. Cray even went as far as conspiring against Mr. Bluford and making federal evidence disappear in a crime where Mr. Bluford was the victim, due to it compromising Mr. Cray.

Assisting Mr. Cray with making his threat come to fruition, was Mr. Bluford's Case Manager, Mrs. Ayala-Pena, Unit Manager, Mr. Sponselor, SIS Lt. Mr. Prock Jr., the Warden DeWayne Hendrix, Dr. Campagna, Dr. Grasley, Correctional Counselor Mr. A Rodriguez, and other staff (DOES 1-99).

The typical stay for an inmate in the Special Housing Unit (the SHU), in the BOP is 3.98 weeks. Mr. Bluford spent nearly 30 weeks in the SHU as a non-violent inmate, not there for disciplinary reasons. In fact, inmates who had broken the law, violated BOP Rules, assaulted and battered others, were caught with drugs, and for other reasons, came to the SHU after Mr. Bluford, and yet left before Mr. Bluford. During his time in the SHU, Mr. Bluford was denied recreation, medical services, and psychology services until staff became aware of this lawsuit

27

about to be filed with the court. Mr. Bluford was even denied visits as staff informed him they would not carry him to the video chat room.

Dr. Grasley and Dr. Campagna have taken oaths to serve their patients but abandoned those oaths in regards to Mr. Bluford to cover for a colleague, and take direction from a non-qualified individual (Mr. Cray), in addition it appeared that they grew concerned with liability and covering their negligence instead of helping Mr. Bluford.

The Defendants actions were malicious, evil, reckless, and grossly negligent, which resulted in great damages against Mr. Bluford both medically and physically.

## CLAIM 14

From June 2021 to June 2022, the Plaintiffs attorney, attempted on dozens of times to call and write Mr. Bluford's Unit Team to set up "Attorney-Client" calls. By policy, Mr. Cray was the individual to contact for an "Attorney-Client" call, so most of the calls and letters were directed to him. However, after months and dozens of calls unreturned (except for a rare, returned call on a Sunday), Mr. Bluford's attorney then started to reach out to other Unit Team staff including but not limited Mrs. Ayala-Pena, and Mr. Sponselor. Again, no calls were ever returned. Finally, Mr. Bluford's attorney even reached out to the Warden, Western Regional Office, and General Counsel's office, yet again, no calls were ever returned.

On Mr. Bluford's end, he submitted numerous written requests to staff forms to Mr. Cray requesting a legal call to his attorney. However, Mr. Cray informed Mr. Bluford that everyone at the institution knows that he's trying to bring legal action against them, and they are not letting that happen. From blocking Mr. Bluford's legal grievances to not allowing him access to his counsel, the Defendants violated Mr. Bluford's constitutional rights to redress the court and endured him to cruel and unusual punishment. At one point, Mr. Cray informed Mr. Bluford that he "just will return his attorneys calls on Sunday when he knows that his office is closed, and I am in the clear."

It should be noted that Mr. Cray became suspicious of Mr. Bluford and his attorney

pursuing a civil action against him, due to him violating attorney-client privileged calls and listening in on (some, not all) Mr. Bluford's privileged calls with his attorney. Mr. Cray would dial the number and then standby to listen to Mr. Bluford's conversation. After the call would end, Mr. Cray would ask specific questions and make remarks regarding the conversation in which Mr. Bluford had just finished discussing with his attorney. Mr. Cray and staff also were aware of Mr. Bluford and his attorney pursuing legal action through and by room searches, in which they read and sometimes confiscated Mr. Bluford's complaint drafts and letters to his attorney.

In 2022, Mr. Bluford began not being able to seal his legal mail with some staff, as he was informed that it "had to be reviewed". In fact, even claims from this original complaint were not filed and came up missing. The Plaintiff just noticed this as he was just recently able to get a copy of the filed complaint.

Mr. Cray even directed an inmate, Keith Harrison to "take care of" Mr. Bluford and make sure that he could not file anymore grievances. This recklessly placed Mr. Bluford's life in danger. Thankfully, the inmate only tried to break Mr. Bluford's arm, instead of killing him. There are no panic buttons in the room, so Mr. Bluford was unable to get help outside of yelling in pain. Mr. Bluford has been in great pain since then, and now requires surgery. In return for the inmate hurting Mr. Bluford, Mr. Cray informed the inmate that he would "make his Incident Report go away and see to it that charges were not filed" against the inmate who harmed Mr. Bluford. It should be noted that the inmate was in the SHU and had threatened and swung on/at a staff member. The inmate was supposed to see DHO (Disciplinary Housing Officer) and/or be referred to the local United States Attorney's Office; however, nothing ever happened to the inmate. After an inmate receives a serious Incident Report, they see DHO or a case is referred to the local United States Attorney's Office within a week or two. Mr. Harrison stayed for over two months with no disciplinary action, and instead was released to go home early.

Mr. Bluford was not allowed to talk to his attorney after his last call in December 2021

through August 2022. Attached hereto as Exhibit 43 is a true and correct copy of the Affidavit from Mr. Zal. All of his attorneys calls and attempts to set up an attorney-client call were denied/unprocessed, as well as Mr. Bluford's requests. Mr. Bluford was not allowed to go to the law library. Once Mr. Cray found out that Mr. Bluford attempted to access the law library and computer in the SHU, informed him that he would never have that opportunity again. In addition, Mr. Bluford was not allowed to have his legal books or his printed legal material which was mailed in from his attorney (not legal mail, but legal research material and anything related to BOP litigation). In fact, Mr. Cray allowed inmates to steal and pack-up Mr. Bluford's personal items (which was against BOP policy), costing Mr. Bluford an estimated loss of over $1,200.00.

These actions of blocking Mr. Bluford from his attorney resulted in many adverse actions and damages to Mr. Bluford. Mr. Bluford was forced to pursue his cases and motions in Pro Se, and unfavorable favorable outcomes, such as Mr. Bluford's motions being denied, being forced to settle actions, and missing appeals deadlines, all due to Mr. Bluford not having the expertise of his attorney, solely due to Mr. Cray and the other Defendants actions.

**CLAIM 15**

Since 2020 continuing to July 2022, whether through indifference or incompetence, Director Carvajal, Regional Director Mrs. Rios, Warden DeWayne Hendrix, and the Defendants were endangering the life of the Plaintiff, in addition to the individuals entrusted to its care by failing to establish consistent and effective safeguards to protect them from the Covid-19 and by subjecting them to conditions of confinement so harsh that mental and physical health are impaired. More than 300+ federal inmates and staff have died from Covid-19, and tens of thousands of others have been sickened, yet the Bureau failed to follow the directives of the Attorney General and health authorities to de-densify its facilities in order to allow for safe distance between prisoners and lower staff-to-inmates ratios. Instead, the Bureau instituted increasingly draconian lockdown measures, confining the Plaintiff and other inmates in small

cells for 23 hours and 45 minutes per day, and at times up to 72 hours straight; sharply curtailing contact with family and friends, cancelling education and rehabilitative programs; eliminating and reducing needed medical care; and providing misinformation that frightened, destabilized, and demoralized, including misleading the Plaintiff and inmates about CARES ACT, Home Confinement, and the First Step Act.

From May 2021 through August 2022, the Bureau was intentionally and negligently increasing the risk of infection to the Plaintiff and all inmates in a number of ways: by failing to test all current inmates for Covid-19; transporting inmates into and out of facilities without testing for Covid-19, allowing staff to enter without being tested and to wear the same gloves, masks, uniforms as they rotate through areas of the compound mixing with quarantined and non-quarantined inmates; failing to provide sufficient cleaning materials needed to disinfect surfaces to avoid infection; allowing guards to not wear mask, gloves, or other PPE equipment while at work; and not taking corrective steps/actions to respond to complaints of Covid-19 risk management negligence by its staff. While a national emergency like the pandemic justified emergency measures, the Bureau's resort to a continuing lockdown, an inability to protect the Plaintiff from Covid-19 with or without the lockdown, resulted in custody that violated the law and Constitution of the United States.

Because no conditions of confinement were constitutionally sufficient to protect Mr. Bluford from Covid-19 at the Federal Correctional Institution at Sheridan, Oregon, where he was housed, and no corrective actions were taken to address the concerns, request and pleas of Mr. Bluford, he seeks relief for his damages.

The prison, Warden, DeWayne Hendrix, BOP Director Michael Carvajal, and the Western Regional Director, Ms. Melissa Rios were all well aware of the issues that Sheridan faced, and the violations of state laws and constitution, as not only had the Plaintiff, Mr. Bluford notified them in person and by writing, but there was an active 2241 Habeas Corpus motion before the court (See *Stirling v. Salazar*, Case No. 3:20-cv-00712-SB) citing the same issues,

requesting several measures including but not limited to (1) Prohibit the Warden from accepting further inmates, until the Warden can demonstrate that adequate quarantining and testing of the new arrivals assures that they are not infected with Covid-19; (2) mandating specific cleaning and social distancing protocols be implemented; and (3) mandating enlargement of custody to allow some inmates (non-violent) to serve their sentence in the communicate on home confinement, until the lockdown has been lifted and safe conditions restored, to be taken to minimize the risk of death or serious injury.

In addition, the government in the above referenced Habeas Corpus motion found that communications with inmates and their attorneys were limited. Attorneys reported that legal mail, which ordinarily is required by law to be opened in the inmate's presence, is not simply opened by prison guards on their own and delivered to the locked-in client. These actions, in combination with the Defendants reading Mr. Bluford's legal writings in his room, which were marked "Attorney-Client Privilege", is how the Defendants became aware of the Plaintiffs planned legal actions against them, which resulted in the launch of a campaign of harassment against him.

Despite all of the notices, warning, and suggestions from professional medical experts to Congress, no measurable actions were taken, which resulted in widespread distress and harm not only to the Plaintiff but other inmates.

A March 2022 DOJ Inspector General Report found that the BOP lacks a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care," and that "the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointment that could delay an inmate's healthcare," the BOP "did not have systems in place to track and monitor the causes for rescheduling appointments, including whether the reason for a cancellation was a BOP issue or one that was out of its control," and the BOP "did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment". This report was consistent

32

if not dead on the challenges in which the Plaintiff endured. His off-site medical appointments were cancelled, he never received adequate medical care, and sat for nearly 9 months, abandoned, left in pain, locked in a cell for 24 hours per day, with no medications nor psychology services, despite the prison knowing the adverse effects of inmates staying in a cell for so long.

Director Michael Carvajal should have taken action, as for the same with Warden, DeWayne Hendrix and BOP Regional Director Melissa Rios. The U.S. Senate Permanent Investigation Subcommittee found that Director Carvajal's tenure was plagued by criminal activity and sexual abuse by guards, prisoner deaths and corruption. Specifically, Chairman Senator John Ossoff and Ranking Senator Ron Johnson said to Director Carvajal "It's almost willful ignorance, and that's what I find disturbing." caricaturing the Directors response to BOPS crises as the Director resembling a "Don't want to what's happening below me. Don't want to hear about rapes. Don't want to hear about suicides." stance. Senator Ossoff stated that "It's a disgrace," "And for the answer to be 'other people deal with that. I got the report. I don't remember.' It's completely unacceptable."

The negligence found within BOP and highlighted by the U.S. Senate Permanent Investigation Subcommittee and other sources are the exact reasons while the Plaintiff suffered great damages, including medically, physically, and mentally. As the Plaintiff reached out to all parties, some corrective action should have been taken. Yet none was.

The spread of the virus within the prisons was rapid due to negligence. According to the Centers for Disease Control and Prevention, people who suffer certain underlying medical conditions face an elevated risk of complications if they contract Covid-19. One of those conditions causing higher risk included heart problems, in which the Plaintiff has.

In order to slow the spread of the virus and to save lives, the CDC issued a series of guidelines recommending "social distancing" of at least six feet distance between people, frequent hand washing, use of alcohol-based disinfection, and wearing of masks. Reports had

indicated that remaining in proximity to others, in closed indoor spaces with limited air circulation, posed increased risk of Covid-19 infection. Furthermore, the CDC specifically provided guidelines for prisons, to avoid increasing the risk for spread of the coronavirus. The CDC even issued guidance urging prison administrators to take action to prevent overcrowding of correctional and detention facilities.

As the spread of Covid-19 escalated, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which modified 18 U.S.C. 3624(c) to enable the Bureau to allow greater use of home confinement and reduce crowding at prisons during the Covid-19 emergency.

As the spread of the coronavirus escalated, Attorney general Barr issued memoranda on March 26 and April 3, directing the Bureau of Prisons to decrease prison populations by transferring medically at-risk prisoner to home confinement. The Attorney General acknowledged that "emergency conditions are materially affecting the functioning of the Bureau of Prisons," and that due to the rapid spread of Covid-19, "time is of the essence." He directed the Bureau "to move vulnerable inmates out "of specific institutions suffering from infection and also out of facilities facing similar serious problems.

Numerous public officials, doctors, and members of Congress issued increasingly urgent calls for the Bureau of Prisons to de-densify its facilities in order to allow adequate distance among incarcerated inmates. The Senators wrote that they reviewed the BOP's Covid-19 Action Plan and noted that it did not include any measure to protect the most vulnerable staff and prisoners. The Senator urged the Department of Justice and BOP to release to home confinement certain individuals who were elderly ill or incarcerated for non-violent offenses and were near release. Two hundred faculty members associated with Johns Hopkins School of Public Health expressed "urgent concern" about the spread of Covid-19 in prisons, jails, and other detention centers. The doctors detailed the many reasons that crowded detention facilities would pose serious health risk for inmates and staff alike.

34

Although the CDC warned that moving inmates among facilities could spread Covid-19, the Bureau slowed but never halted inmate transportation.

The BOP announced lockdowns back in March of 2020 and continued them till mid-2022. The Bureau knew of the adverse effects long lockdowns would have on inmates mental health yet took no corrective action.

During the lockdown, conditions became less sanitary. Toilet paper was unavailable, trash was not being collected from inmate cells, laundry was impossible as the Plaintiff only had 15 minutes out of his cell, and showers were only allowed once every three days. Not even sufficient cleaning supplies or soap was available at times.

As the suicide and Covid-19 death rate increased, as well as physical (fights) incidents amongst inmates, BOP still failed to take adequate measure to manage Covid-19, de-densify the population, and keep inmates safe by providing medical, safety and security services.

The Bureau of Prisons violates the Eight Amendment if it confines a criminal detainee in unsafe conditions. *Helling v. McKinney*, 509 U.S. 25, 32 (1993). Punishment without full compliance with the Fifth and Sixth Amendments violates the right to due process of law. See e.g. *Crawford v. Washington*, 541 U.S. 36, 68 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000); Gideon v. Wainwright, 372 U.S. 335, 344-45 (1963).

Mr. Bluford was unlawfully detained which resulted in great injuries both physically and mentally to him and should be granted relief because his detention which violated the laws and Constitution of the United States was the proximate cause of his damages.

**CLAIM 16**

From January 2022 through August 2022, Mr. Bluford was being housed in the SHU, at Federal Correctional Institution Sheridan. The institution is not ADA complaint and Mr. Bluford is protected under the Americans with Disabilities Act, as he is wheelchair bound and cannot walk. On several occasions Mr. Bluford requested reasonable accommodations be made, however, his requests were denied and not responded to (See Exhibit 37 – some of Bluford's

request for ADA accommodations).

Upon Mr. Bluford arriving to the SHU, he had to have numerous staff pick him up while in his wheelchair to carry him up/down the stairs within the SHU housing unit to get to his new cell/room. Courts have held that placing a wheelchair bound prisoner in a non-wheelchair-accessible SHU for a couple of months created an atypical and significant hardship for that person. See *Serrano v. Francis*, 345 F.3d 1071, 1079 (9th Cir. 2003) (stating "the conditions imposed on Serrano in the SHU, by virtue of his disability, constituted an atypical and significant hardship on him."). While in the SHU, Mr. Bluford was not allowed to leave his room, except 4 or 5 times, from January 2022 through August 2022. Mr. Bluford had no access to recreation, the law library, legal calls, or anything. Mr. Bluford was subjected to extreme cold weather, mold in the room, insects, feces for several days from an institutional flood, a blacked out window, and only one 10-15 minute call per month to his wife and children.

While housed in the SHU, inmates must be at their room door between 5:00 and 6:00 in the morning in order to sign up for recreation. No clocks are available or even seen by inmates in the SHU. There are no verbal notices or sound indicators to let inmates know that the time is between 5:00 a.m. and 6:00 a.m.

Nonetheless, Mr. Bluford has requested and been at his room door numerous times to only be passed by or told "no" that he "cannot go to recreation" because "staff are not going to pick him up and carry him up the stairs and outside", as the SHU doesn't have ramps and is not ADA complaint.

Not only was Mr. Bluford not allowed recreation while in the SHU, but he was also no longer allowed access to the law library, rarely allowed a grievance form or Inmate Request to Staff form, his only surviving legal books and printed legal material were withheld from him, and all of his legal calls were denied (both his request and all of his attorney's request). Mr. Bluford was literally locked away and abandoned.

Mr. Bluford did not see the sun or sky, have fresh air, or be allowed to go to recreation

36

from January 2022 to August 2022. The Defendants, including but not limited to, the Warden, DeWayne Hendrix, BOP Director Michael Carvajal, BOP Western Regional Director Melissa Rios, Associate Warden R. Bills, Mr. Cray, Mrs. Ayala-Pena, and staff (DOES 1-99) were informed of this, yet failed to take action to correct the situation.

The Defendants had a duty, yet breached that duty, which caused Mr. Bluford to be deprived of life and liberty, endure cruel and unusual punishment, and suffer numerous physical and mental damages, all to which violate Mr. Bluford's constitutional rights, and cause him pain and suffering.

As Mr. Bluford has been stuck in his room from January 2022 - August 2022 (minus the 4 or 5 times he was required to go down the hall to meet with staff, and the other to be able to cut his hair), Mr. Bluford's depression and anxiety amplified, and his physical state deteriorated. Mr. Bluford unsuccessfully attempted suicide by trying to hang himself after no psychology services were being provided to him, despite his over 2 dozen request over months.

Mr. Bluford even had to live with inches of feces, urine and sewage water in his room for several days, as no adequate cleaning equipment/supplies was provided after institutional plumbing issues. The tier in which Mr. Bluford was housed on literally flooded with human feces from all institution inmates and staff and filled Mr. Bluford's room. Yet, Mr. Bluford wasn't provided any adequate cleaning solutions or help to remove/clean it as Mr. Bluford is wheelchair bound and didn't have a roommate.

Mr. Bluford had to eat, sleep and live in a human feces infected/flooded room for days. Throwing up and becoming sick, Mr. Bluford still received no medical services. Staff eventually providing Mr. Bluford with one Styrofoam cup of some sort of cleaner, which was not adequate for the size of the cleaning required nor efficient to disinfect human waste. Furthermore, Mr. Bluford requested assistance in cleaning up the feces as no gloves or mask were provided, and Mr. Bluford was unable to get out of his wheelchair onto the ground to clean up the feces. No help was provided, outside of one staff attempting days later to mop out some

37

of the feces unsuccessfully as due to Mr. Bluford's flooring being unleveled, coming back into the room.

Living in feces is inhumane and states a claim of constitutional violations. See *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (holding 36 hours' subjection to unsanitary flooding and exposure to human waste stated a claim; "exposure to human waste carries particular weight); *Gatson v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (plaintiff's allegation that for several days the area in front of his cell was filled with feces, urine, and sewage water, stated an Eight Amendment claim).

Mr. Bluford attempted to file a grievance but was denied the forms, and informed that the issue was non-grievable. Mr. Bluford still submitted a complaint written out on paper and was informed that it was thrown away and would not be processed.

### CLAIM 17

On January 25, 2022, Mr. Bluford was transferred to the SHU at Federal Correctional Institution Sheridan. Mr. Cray informed Mr. Bluford that he would see to it that Mr. Bluford would spend "many months" in the SHU, as he could influence the investigation time period from 30 days to 90 days, (which he did), by talking to his friends in SIS and having them kicking the case/investigation months down the road (which they did). Furthermore, Mr. Bluford was informed that he would get "Diesel Therapy".

Finally, Mr. Cray informed Mr. Bluford that they were going to ship Mr. Bluford further away from his home, despite the new First Step Act requiring stating that inmates would be transferred to facilities within 500 miles of their residence. Yet, Mr. Bluford was ultimately shipped to another state, which was over 800+ miles away from Mr. Bluford's residence. In addition to this, not only was Mr. Bluford shipped over 800+ miles from his residence, Mr. Bluford was shipped to another "Medium Security Level" institution instead of a "Low Security Level" institution, as he is classified as a "low security level" inmate.

Mr. Cray then continued on that he, the Unit Team (Mrs. Ayala-Pena and Mr.

38

Sponselor), and SIS could then "accidentally mess up his transfer paperwork" which would cause Mr. Bluford to remain in the SHU, under 24-hour lockdown, 7 days per week, even longer. All of Mr. Crays threats always materialized. Mr. Bluford remained in the SHU for nearly 30 weeks, as a non-violent offender, who was placed in the SHU for non-disciplinary reasons. The typical stay for an inmate in BOP to be in the SHU is 3.98 weeks, yet Mr. Bluford spent nearly 10 times that amount in the SHU, despite not being there for disciplinary reason. In fact, inmates who committed new crimes, assaulted and battered others (inmates/staff), smuggled drugs, and who made/got caught with alcohol had spent less time in the SHU, when compared to Mr. Bluford. Mr. Bluford was being falsely imprisoned and held in the SHU for exercising his constitutional rights.

Furthermore, the Defendants informed the Plaintiff that they would not recommend him or enter a designation location for him, which in tail would make him go to another "Medium Security Level" institution. Nor would they enter that the Plaintiff is a "Low Security Level" inmate. Finally, in their acts of retaliation, Mr. Cray informed Mr. Bluford that he would contact colleagues at DSCC to make sure that Mr. Bluford would indeed to go to another "Medium Security Level" facility.

The Defendants actions were reckless, malicious, and negligent, which directly caused them to breach their duty, which caused numerous physical and mental damages to Mr. Bluford. Furthermore, their actions were malicious, and resulted in cruel and unusual punishment, which violated Mr. Bluford's constitutional rights.

**CLAIM 18**

From January 25, 2022 through August 2022, Mr. Bluford was housed in the SHU at the Federal Correctional Institution Sheridan. During these months while Mr. Bluford was in the SHU, he was consistently denied medical attention and services.

Despite Dr. Grasley and the medical department (DOES 1-99) knowing that Mr. Bluford had several active/"current" conditions that needed attention, they ignored his request and

neglected him. Mr. Bluford's state deteriorated, and his legs further deconditioned as his chronic/severe pain increased. See Exhibit 11 – copy of Mr. Bluford's BOP Medical Records listing "Current" medical issues. Mr. Bluford placed dozens of medical requests for help prior to being moved to the SHU in January (See Exhibit 8 – some of Mr. Bluford's medical request), and dozens while in the SHU (See Exhibit 16 – some of Mr. Bluford's medical request from SHU), and request after being transferred from the SHU and institution, finally receiving medical attention in late September 2022 and needed medications.

Mr. Bluford's off-site medical appointments were cancelled as well and never rescheduled while he was at Federal Correctional Institution Sheridan.

Upon Mr. Bluford requesting a copy of his medical record, he found that nearly all of his request for medical services were discarded/missing, and not part of the record. Furthermore, the medical records in which the institution received (Bluford Kaiser Permanente records) documenting Mr. Bluford's heart conditions (bradycardia, PVCs, palpitations, etc.) and anxiety disorder, where no longer part of the record as well.

The actions by the Defendants were reckless, fraudulent, and malicious, which resulted in Mr. Bluford suffering numerous physical and mental injuries. Furthermore, their actions resulted in cruel and unusual punishment, deprived Mr. Bluford of life and liberty, and violated other state and constitution laws.

Mr. Bluford notified staff during walkthroughs, filed grievances which were returned unprocessed, and not returned or rejected due to Mr. Cray not logging Mr. Bluford's level 1 complaints.

**CLAIM 19**

In June of 2021, Mr. Bluford brought to the attention of his Unit Team (Mr. Cray and Mrs. Ayala-Pena) an error that he discovered regarding his security level score. Initially Mr. Bluford's Unit Team said there was "no error", however, after Mr. Bluford persisted and worked with the Federal Correctional Institution Sheridan Education Department and his

attorney to verify this error, they then acknowledged the error, but refused to take corrective action. Instead, Mr. Cray and Mrs. Ayala-Pena told Mr. Bluford to "just wait until his annual review, and then it'll be fixed."

Mr. Bluford did not want to wait for his annual review, as the error was causing him to be housed with more violent offenders than what he should have been housed with. Additionally, Mr. Bluford's housing wasn't consistent with the Bureau of Prisons policy regarding classification amongst other intentions and sections of their policies.

After Mr. Bluford and his attorney reviewed the Bureau of prison policy, they learned that the CMC (Case Manager Coordinator) should have been notified by Mr. Bluford's Unit Team regarding the scoring error, and then that the CMC should contact DSCC through GroupWise.

Mr. Bluford initially reached out to the CMC, Ms. Bunsold. However, after several weeks of no response, then his attorney reached out to her notifying her of the error and requesting corrective action. Again, no corrective action was taken. Mr. Bluford was informed to just wait until his team review meeting to have his points updated, and that since he had more than a year of time left on his sentence, that there was no need to rush his transfer. Upon that, Mr. Bluford's attorney then sent an official legal letter to Ms. Bunsold in response to that answer being given to his client, where he provided her certified copies of the documents needed to correct his client's classification/score, and informed her of the possible liability and negligence that she would have should something happen to Mr. Bluford (See Exhibit 20 - Mr. Zal's letter to Ms. Bunsold). At that point, all communications with Ms. Bunsold stopped.

Mr. Bluford would go on to contract Covid-19, be revived and taken to the emergency hospital, suffer additional sicknesses, be assaulted and battered by inmates, extorted, and more, all due to no corrective action being taken by Ms. Bunsold and the defendants.

Upon Mr. Bluford suffering these injuries and more, his Case Manager, Mrs. Ayala-Pena still refused to follow policy, and yet did the opposite by retaliating against Mr. Bluford.

Mr. Bluford wrote Ms. Bunsold asking for help and that a new Case Manager be assigned to him while describing some sensitive complaints against Mrs. Ayala-Pena and Mr. Cray in a separate letter. Ms. Bunsold's response instead of helping, taking concern and looking into these matters or reporting them, decided to forward the sensitive complaints and each individual directly to them instead. This resulted in even further retaliation to Mr. Bluford from his Unit Team.

Ms. Bunsold had a duty and breached that duty intentionally. Her actions were malicious and resulted in cruel and unusual punishment against Mr. Bluford. Mr. Bluford of course attempted to file a complaint (which it was returned unprocessed and then rejected), then again reached out to the Warden and other BOP agencies for help. Again, Mr. Bluford would go on to not receive any responses.

The Defendants actions were reckless, negligent, malicious and resulted in great damages against the Plaintiff, including but not limited to medical and physical injuries.

**CLAIM 20**

In the months of December 2021 and January 2022, Mr. Bluford was being extorted by inmates. They demanded majority of his commissary and had him send money via his wife to their agents on the outside via electronic wires/transfers.

Eventually Mr. Bluford's account balance was depleted, and Mr. Bluford was placed on "FRP Refusal" status. Due to the inmates directing Mr. Bluford to move his funds around via BP-199 and then cancelling them, two FRP payments were not fully deducted from his account. It should be noted that Mr. Bluford was forced to sign a payment agreement (FRP Contract) with no payment due date.

When Mr. Bluford went to the lieutenant's office, he was able to notify staff of this. however, Mrs. Ayala-Pena refused to issue him a new FRP contract, since he had filed a complaint against her and others. In fact, Mr. Bluford despite his over 12 requests, was no longer able to make any restitution payments for nearly 8+ months due to Mrs. Ayala-Pena

blocking him and taking it within her own accord to prioritize punishing Mr. Bluford in retaliation, above not allowing Mr. Bluford to pay back the victim of his crime restitution.

Mr. Bluford then filed a complaint and appealed it to the Warden, which was received by the Associate Warden R. Bills. Mr. Bills refused to properly investigate the matter, and just relied on My. Bluford Unit Team to convey their version of why Mr. Bluford was now on FRP refusal status. In A.W. Bills response, the facts were manipulated, and he failed to take into consideration Mr. Bluford's extortion and simple denied the complaint. Mr. Bluford attempted to initially appeal the decision, however, was not given the proper forms. Nonetheless, he still submitted an appeal in which no response was ever received. After the appropriate time, Mr. Bluford then appealed again due to no response.

It should be noted that other inmates under Mrs. Ayala-Pena's caseload would receive new FRP contracts when they requested them. In addition, Mrs. Ayala-Pena required such a high restitution payment from Mr. Bluford only for retaliatory reasons. Another inmate (Lonnie Lillard) who had several million dollars owed in restitution and had just under $2,000.00 sent to him within 6 months, who was assigned to Mrs. Ayala-Pena as his Case Manager was only required to make under $150.00 monthly payments. Mr. Bluford's restitution amount owed doesn't even compare to Mr. Lillards, yet he was ordered to pay higher monthly payments.

Mrs. Ayala-Pena abused her position and retaliated further against Mr. Bluford by intentionally trying to cause him to fail. Her efforts of retaliation stemmed from Mr. Crays campaign of harassment, which included Mr. Bluford Unit Team (Mrs. Ayala-Pena and Mr. Sponselor).

**CLAIM 21**

On or about July 2022 and August 2022, additional staff were brought into the Federal Correctional Institution Sheridan to assist with all of the problems that the institution was facing, which included but was not limited to being understaffed, corruption, conditions of confinement that violated constitutional rights and further resulting in widespread distress and

43

harm, and no adequate medical services. These problems were constantly being highlighted in Court which were then being published therefore causing the institution and staff embarrassment and demanding more oversight. Attached hereto as Exhibit 44 is Petitioners Status Report filed by Lisa Hay.

The Bureau of Prisons sent the Western Regional Director, BOP Director and others to check on the troubled institution. During these visits, Mr. Bluford gave letters to them notifying them of all the challenges, retaliation, and illegal activity that he faced. Yet nothing was ever done. In fact, while speaking with the Director, Mr. Bluford informed him that he had written everything down and enclosed it for him. The Director informed Mr. Bluford that he wasn't going to take the letter from his door, but have the Warden, DeWayne Hendrix, who was standing next to him take it, scan it and give it to his people due to Covid-19 prevention measures. Yet again, no answer ever came.

Staff did read Mr. Bluford's complaint letter to the Director and started treating him even more harshly. One staff member even opened Mr. Bluford's lunch tray slot, handed his roommate lunch, and then told his roommate to move, then he threw Mr. Bluford's lunch crate/box at him in the face. Staff are not supposed to reach into inmates' rooms in the SHU. You can see from the video footage that a litigation hold was placed on, the officer taking a knee to lower himself, extend his arms into the cell through the tray slot and then launch a lunch at the Plaintiff. These types of retaliatory actions were taking place at large as reported by numerous inmates. Attached hereto as Exhibit 45 is a true and correct copy of the Letter from Lisa Hay citing abuse and physical beatings.

The Defendants actions were reckless, malicious, and negligent which resulted in damages to the Plaintiff.

## CLAIM 22

On May 20, 2021, Mr. Bluford, a non-violent offender, self-surrendered himself to the custody of the Federal Bureau of Prisons, Federal Correctional Institution at Sheridan, Oregon,

to begin his sentence.

Upon being processed and assigned to the unit 2 housing, the Plaintiff was introduced to the Correctional Counselor for that unit, Mr. Brent Cray. For an unknown reason, the Plaintiff observed and witnessed Mr. Cray inform and request that the Plaintiff be housed in the "Special Housing Unit" ("SHU"), since Mr. Cray did not have any room for a "black", and to just put on the paperwork that the Plaintiff was being placed in the SHU "pending classification".

The Plaintiff claims that for Mr. Cray to have reassigned him to the SHU based on his race, was not only discriminatory, therefore violating the Equal Protection Clause, but also constituted cruel and unusual punishment.

While the Plaintiff was housed in the SHU, he suffered from depression and anxiety. Plaintiff was not only segregated from the general population, but placed in a "SuperMax" cell, and therefore subjected to the same punishment of those inmates in punishment (being housed in the SHU) for violence within FCI Sheridan and awaiting new criminal charges and/or for other disciplinary action.

After several weeks of the Plaintiff being housed in the SHU unlawfully, staff grew concerned and offered the Plaintiff to be housed temporary in another housing unit (Unit 1A). The Plaintiff was then moved to Unit 1A, and then moved again several days later into his assigned housing unit (Unit 2A), where he was immediately housed in a "black" cell.

During the Plaintiffs entire time while housed in the general population, he was only allowed to be housed with other "black" inmates, despite his many requests to Mr. Cray, Mrs. Ayala-Pena, and the Unit Manager.

Racial segregation is a practice that both Mr. Cray and Mrs. Ayala-Pena are aware of, implement, and manage. Plaintiff will prove this by FCI Sheridan records, and security footage that the Plaintiffs attorney has previously requested "Litigation Holds" on.

**CLAIM 23**

During June 2021 and through August 2022, the Plaintiff had his due process rights

45

violated many times all due to Mr. Cray and Mrs. Ayala-Pena retaliating against him for exercising his constitutional rights. Now the Plaintiff has lost out on earning additional time off his sentence.

The Plaintiff is entitled to "Team Meetings" once a year, which according to the Bureau of Prison policy include the Plaintiff, and his/her Correctional Counselor (Mr. Cray), Case Manager (Mrs. Ayala-Pena), Unit Manager, a representative from the Education Department, and a representative from the Psychology Department. During these collective meetings, the staff collaborate with the inmate (the plaintiff) to identify courses, goals, FRP payments, and other productive matters. Another major action that takes place at these meetings, is that the inmate is scored. This can result in the inmate being transferred to either a lower security facility, a higher security facility, or no transfer at all, cased on the scoring that the inmate received.

Due to the Plaintiff logging reports of threats with the psychology department, his Unit Team did not invite nor notify the Psychology Department of his Team Meeting, as they (Dr. Bindl) would have obviously spoken up regarding the retaliation of not scoring Mr. Bluford properly. In addition, no representative was notified from the Education Department, as they would have made sure that Mr. Bluford received credit for participating in his Vocational Certificate Program, earning his Bachelors Degree, and working as a G.E.D tutor to help other inmates academically while lowering their chances of recidivating. Again, these acts were done intentionally, so that Mr. Bluford's Unit Team could improperly score him, as they threatened to do so previously, due to him exercising his constitutional rights.

The plaintiff was not only deprived of these full collective effort meetings but was forced to sign agreements that were already prepared without his or other staffs input. Furthermore, the Plaintiff was threatened by Mr. Cray and Mrs. Ayala-Pena prior to these meetings, that he would be not scored properly due to his complaints. These actions not only violated the Plaintiffs due process, but deprived him of life and liberty, and subjected him to

46

cruel and unusual punishment. These actions contributed to keeping the Plaintiff at FCI Sheridan, where he endured great damages including but not limited to medical and physical injuries.

By not scoring Mr. Bluford properly for his Custody Score and PATTERN Score, he therefore missed the opportunity to have additional time taken off of his sentence for being scored with a "Low Recidivism Level" PATTERN score, therefore making him stay in the Bureau of Prisons longer, and not be eligible for earlier participation in RDAP and other vocational, apprenticeship and BOP programs, which would allow him to earn 3 years off of his sentence.

The Defendants actions were malicious, negligent, reckless, and resulted in numerous state and constitutional laws being violated, which in turn resulted in great damages to the Plaintiff.

### CLAIM 24

In September 2021, the Plaintiff contracted Covid-19 and was sent to the Salem Emergency Hospital. Upon returning to Federal Correction Institution Sheridan, days later he requested his legal books and material being that he was placed in the gym for quarantine, and therefore separated from him property. Mr. Bluford was requesting his legal material so that he could request a Compassionate Release, since he was obviously "High-Risk" for Covid-19, suffered a debilitating injury, and was not receiving adequate medical services. In fact, the government, including but not limited to the Oregon United States Attorney's Office, Oregon Chief Federal Public Defender - Lisa Hay, Infectious Disease and Health Consultants, and others inspected the institution that month, and found that FCI Sheridan did not have an adequate Covid-19 medical plan, that inmates did not have access to medical services, that the conditions of confinement were resulting in widespread distress and harm, and that overall the inspection corroborated accounts of "inhumane" conditions.

FCI Sheridan attempted to get the Plaintiff his legal resources by requesting them from

47

Mr. Cray and Mrs. Ayala-Pena. Unfortunately, Mr. Cray informed staff that Mr. Bluford was trying to sue the prison and him and that he would therefore not bring him any of his stuff. Staff then requested Mr. Bluford's stuff from Mrs. Ayala-Pena receiving a similar response. Thankfully, staff grew concerned and decided to email Mrs. Ayala-Pena to get her response on record, at which point Mrs. Ayala-Pena replied and stated that Mr. Bluford could not have his legal material as it was contaminated. Which made no sense as Mr. Bluford was allowed to have his other property, and new inmates kept coming into the quarantine unit almost daily.

Ultimately, Mr. Cray and Mrs. Ayala-Pena let inmates pack-up the Plaintiffs room, which is against BOP Policy) and they either lost or stole nearly all of Mr. Bluford's legal books and resources. Over $1,200.00 worth of property gone. The Plaintiff ended up filing a Federal Tort Claim (#TRT-SER-2022-04081). Attached hereto as Exhibit 46 is a true and correct copy of Mr. Bluford's Federal Tort Claim for his books and property.

The actions by Mrs. Ayala-Pena and Mr. Cray were deliberate and violated the Plaintiffs right to access the court and subjected him to further cruel and unusual punishment.

**CLAIM 25**

From June 2021 and until August 2022, the Plaintiff consistently filed or attempted to file complaint(s), otherwise known as Request for Administrative Remedy, each time his rights were violated. These actions (Mr. Bluford exercising his constitutional rights) were the direct cause for Mr. Bluford being subjected to illegal activity and adverse actions such as physical harm, retaliation and a campaign of harassment against him by the Defendants.

Mr. Bluford's Request for Administrative Remedy would often be returned unprocessed, ripped up in front of him, or he would be informed they were lost - in which Mr. Bluford then would resubmit them. In addition, Mr. Cray would intentionally not log Mr. Bluford's first level complaints, which would then automatically reject any appeals or further complaints submitted regarding that matter by the Warden, Regional Office and General Counsels office.

The Plaintiff being subjected to these acts then reached out the BOP Western Regional

Director, and even to the BOP Director himself. Mr. Bluford even gave a letter to the BOP Director upon his visit to FCI Sheridan alerting him of the actions taking place. Mr. Bluford pleaded and requested that levels of the Request for Administrative Remedy process be waived as he was intentionally being blocked, threatened which always materialized, and retaliated against. Mr. Bluford even enclosed copies of his sensitive complaints to them. In addition, Mr. Bluford requested to be transferred to Terminal Island, were he could receive adequate medical services and physical therapy. Mr. Bluford explained to the Director and Regional Director, that he requested a transfer at FCI Sheridan (after finding out that he would be transferred), as Terminal Island is a "Low Security Level" institution, and that he is classified as a "Low Security Level" inmate.

The Plaintiff was threatened that physical harm would come to him if he continued on with his Request for Administrative Remedies, and as promised and directed by Mr. Cray, these threats materialized ultimately causing Mr. Bluford serious harm which has now require Mr. Bluford to have surgery and psychology / mental health services, and making a clear point to the Plaintiff, that he does not have the right to redress the Court as those options are truly unavailable to him, unless he wanted to risk his life, which no common/average person would do. During June 2021 through August 2022, Mr. Cray went to extreme measures to block and deny Mr. Bluford available remedies. At one point Mr. Cray had printed out articles including a picture of Mr. Bluford regarding him cooperating with the government. Mr. Cray informed Mr. Bluford that he was about to "pass out some reading material to the inmates" since they "have so much time to listen to you [Mr. Bluford] about this Lisa Hay lawsuit bullshit". This ultimately caused great fear to the Plaintiff, as he was being housed with inmates and knew that he could be killed if his cooperation became known amongst them.

The Defendants actions were evil, malicious, reckless, illegal, and negligent, which resulted in the Plaintiff enduring great damages which include but are not limited to medical, physical and psychological damages.

**CLAIM 26**

From April 2022 through June 2022, Correctional Counselor Brent Cray directed and offered relief to an inmate if he would "take care of" Mr. Bluford and make sure that Mr. Bluford "couldn't file anymore grievances". The inmate agreed and thankfully only tried to break Mr. Bluford's arm. Since then, Mr. Bluford has been in extreme pain, has lost full function ability with his arm, and is awaiting a final MRI/CT Scan and then surgery.

In return for the inmate "taking care of" Mr. Bluford, Mr. Cray assured the inmate that he would make sure that the inmates pending incident would not be referred to the United Sates Attorneys Office for prosecution, and he would make sure that he wouldn't have to go before the Disciplinary Hearing Officer, which would have resulted in the inmate losing Good Conduct Time and staying in prison longer.

The inmate's pending incident was for threatening bodily harm to a Correctional Officer and swinging at the officer and hitting the glass between the two during the altercation. The inmate had immediately received an Incident Report that day, and by BOP policy, was supposed to go before DHO within 5 days. Yet, Mr. Cray, using his influence, allowed for 60 days to pass and for the inmate to go home early. Since then, Mr. Bluford's mental health state and physical wellness has continued to deteriorate. Mr. Bluford was intentionally neglected and punished and had to wait several months until being transferred to receive medical care, which was immediately provided to him upon his transfer. High dosage pain medication and nausea prescriptions were issued to Mr. Bluford upon his first medical exam, and during the exam, the doctor informed Mr. Bluford that he likely has a torn rotator cuff, which would require surgery to fix. The doctor then scheduled Mr. Bluford for all necessary medical appointments and follow up care that were not provided to Mr. Bluford at FCI Sheridan.

Given the conditions of Mr. Bluford's particular confinement, the trauma, abuse and abandonment that he has endured over the last nearly year and a half, he has fallen into a serious state of depression and even attempted suicide unsuccessfully.

It is well known that keeping an individual in solitary confinement, especially when they already suffer from a mental disorder (Mr. Bluford has a known, medically documented anxiety disorder), has extreme adverse effects. In fact, the court has said "a considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them", and that "others, still, committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of aby subsequent service to the community." See *In Re Medley,* 134 U.S. 160 (1890).

Mr. Bluford, before self-surrendering to the BOP, was an entrepreneur who had a proven track record of building companies that grew into the 10-15 million dollar valuations. These valuations are supported by investments from financial institutions, venture capitalists, and accredited investors, all who invested in Mr. Bluford's complaints, despite him being a convicted felon. Mr. Bluford was even accepted into a Silicon Valley exclusive incubator/accelerator program that has a lower acceptance rate than Harvard and Stanford, which include partners of Apple, Microsoft, Amazon, Facebook and other Fortune 500 companies.

Nonetheless, Mr. Bluford is no longer able to continue on with his entrepreneurial success. This is directly due to the defendants' actions in which they intentionally violated state and constitutional laws and caused the plaintiff significant injuries. The plaintiff now struggles to even write, type and focus, as his physical and mental state has been greatly affected.

The defendants' actions were malicious, reckless and negligent. The plaintiff and his attorney took septs to notify the Warden DeWayne Hendrix, BOP Western Regional Office Director Melissa Rios, the BOP General Counsel, and the BOP Director Michael Carvajal. No action was taken to help Mr. Bluford, and therefore he continued to suffer greatly, and will most likely require counseling, mental health services, and assistance for his remaining life.

51

## CLAIM 27

From May 2021 through August 2022, the BOP Director, Michael Carvajal, BOP Western Regional Director, Melissa Rios, Warden DeWayne Hendrix, the defendants and other FCI Sheridan staff (DOES 1-99) refused to manage and enforce Covid-19 sage practices. Furthermore, they knowingly allowed staff who were not vaccinated to be in close contact with inmates, which recklessly increased the risk and spread of Covid-19 inmate and staff deaths.

Even after the president's office set a deadline for all federal employees to be vaccinated by November 22, 2021, Sheridan staff vaccination levels remained under 60%. Attached hereto as Exhibit 47 is a true and correct copy of the Executive Order on requiring vaccinations for federal employees.

These actions contributed to the unconstitutional conditions of confinement, and created a hazardous living facility which ultimately caused the plaintiff to suffer physical, mental, and medical damages.

Aside from the defendants not requiring their staff to be vaccinated, nor simply reassigning non-vaccinated personnel so that they would bot be in closed contact with inmates, the defendants also failed to separate non-vaccinated inmates from vaccinated inmates on numerous occasions, which lead to the plaintiff suffering damages (physical, mental and medical).

## V. EXHAUSTION OF AVAILABLE REMEDIES

Mr. Bluford has exhausted all administrative remedies regarding all claims foregoing that were available to him.

///

///

///

**RELIEF**

Wherefore, Plaintiff request that this Court grant the following relief:

1) Declare that the Defendants violated Plaintiff's Constitutional Rights

2) Issue an injunction requiring that Defendants implement a new electronic Administrative Remedy Process that would bypass inmates being required to get forms from staff members.

3) Award compensatory damages of $500,000.00 for the Plaintiff's physical, mental injuries, and for his pain and suffering against each defendant jointly and severally, and $25,000,000.00 in punitive damages against the defendants jointly and severally.

4) Award the Plaintiff all legal fees that he paid to individual attorneys and licensed Legal Document Assistant companies for legal services and document preparation services that are directly related to these claims.

5) Prisoner Release Order: Declare that the Plaintiff be released to Home Confinement to finish his remaining sentence

6) Grant or Order the Defendants grant Mr. Bluford the maximum time allotted (28 months) for Home Confinement under 3624(g) should he not be released

7) Order the Defendants to expunge Mr. Bluford's Incident Report

8) Order the Defendants to rescore Mr. Bluford to accurately represent removal of the Incident Report regarding his Custody Score and PATTERN Score.

9) Order the Defendants to the Plaintiff for his physical therapy and counseling services, and to immediately start providing these services to him weekly should he not immediately be released

10) Order the United States Attorney's Office, Bureau of Prisons Internal Affairs, and Office of Inspector General investigate all claims against the Defendants immediately

11) Order directing the Defendants to install panic buttons in the SHU for medical and safety emergencies

12) Grant Plaintiff such other relief as it may appear Plaintiff is entitled to.

13) Award future loss of income damages to the Plaintiff for the damage done to his arm and

53

mental state from the Harrison assault and battery directed by Mr. Cray, and punitive damages.

Pursuant to 28 U.S.C. 1746, I verify under the penalty of perjury that the foregoing is true and correct.

Dated: October 31, 2022                     Derek Bluford

                                            Plaintiff, In Pro Se
                                            FCI Phoenix
                                            37910 N. 45th Ave
                                            Phoenix, AZ 85086

54